**In re HOTEL TELEPHONE CHARGES.**[*]
**No. 73-1107.**

United States Court of Appeals,
Ninth Circuit.
June 19, 1974.

---

[*] Consolidated with; Hafif v. Hilton Hotels Corp., (two cases); Colson v. Fairmont Hotel Co., Inc.; Colson v. Radisson Denver Corp.; Hicks v. Hilton Hotels Corp.; Colson v. Hilton Hotels Corp. (five cases); Colson v. Hotel Waldorf-Astoria Corp.

See also, Jud.Pan.Mult.Lit., 341 F. Supp. 721, 374 F.Supp. 1402.

E. Judge Elderkin (argued), of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellants.

Joseph W. Cotchett (argued), of Cotchett & Hutchinson, San Mateo, Cal., for appellee.

## OPINION

Before ELY, TRASK, and WALLACE, Circuit Judges.

ELY, Circuit Judge:

This appeal is from an Order allowing the appellees' consolidated actions to be

maintained as a class action under Rule 23, Federal Rules of Civil Procedure. Permission to appeal the interlocutory Order was granted pursuant to 28 U.S. C. § 1292(b).

The first action in this case was filed in the Central District of California, and shortly thereafter, ten similar actions were filed in nine other districts. The Judicial Panel on Multi-District Litigation ordered the consolidation of all the actions in the Central District of California. The complaints allege a nationwide conspiracy among forty-seven hotel chains and approximately six hundred individual hotels to increase room rates in violation of federal antitrust laws and state laws. The appellants allegedly acted in concert to add a surcharge for telephone services to the quoted room rate. The appellees further alleged that such a charge, generally amounting from one to three percent of the quoted room rate, was labeled a tax or otherwise confusingly mislabeled.[1] On the basis of these allegations, the appellees seek recovery for themselves and for all other hotel guests similarly surcharged, a class consisting of an estimated forty million persons. The parties agree that the claim of the average class member would be about $2.00 per person in the event of recovery. Settlements on behalf of the class have been reached with a few of the defendants, and settlement orders setting out the terms of the agreements and providing for their submission to the class have been entered in the Northern District of Illinois.

Here, the controlling issue is whether the District Court correctly applied Rule 23(b)(3) in determining that the actions were appropriate for class action treatment. Rule 23(b)(3) requires that common questions of law or fact predominate over any individual questions, and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. While these two requirements are to some extent interrelated, they are not co-extensive and each requirement must be met. *See* LaMar v. H. & B. Novelty Loan Co., 489 F.2d 461 (9th Cir., 1973). We are firmly convinced that, in these cases, the appellees did not make an adequate showing of proof as to either element of Rule 23(b)(3).

### I. Common Questions Do Not Predominate Over Individual Questions

Two types of claims have been brought by the appellees: (1) claims that the appellants conspired to violate the federal antitrust laws; (2) pendent state claims primarily based on statutory or common law fraud.

The state fraud claims raise individual issues as to whether each of the six hundred hotels falsely represented or concealed the nature of the charge, as to individual reliance on any alleged misrepresentation, and as to the specific amount of damage suffered by each member of the class as the result of the alleged misrepresentation. The appellees argue that these individual questions can be conveniently dealt with by allowing them to recover if it is proved that the appellants did participate in a "fraudulent scheme," thereby fusing the separate elements of a fraud action into a single conspiracy issue. That same argument was made in Cotchett v. Avis Rent-A-Car System, Inc., 56 F.R.D. 549 (S.D.N.Y.1972), a case which also involved an alleged conspiracy fraudulently to impose a surcharge on customers. In *Cotchett* the court wrote:

"... [T]he second, third, and fourth stated claims ... allege active concealment, failure to disclose, fraud, and reliance. ... [T]hese allegations raise such individualized questions of law and of fact as to overwhelm whatever kernel of common issues might be involved; with

---

1. While appellees alleged that all the appellants sought to disguise the surcharge as a local tax, they then further alleged that the charges were variously labeled "Tx Tms",
"Rm Tx", "Sundries", "Misc.", "In Tms", or "GMS." Moreover, some defendants charged a flat fee, while others charged varying percentages of the room rate.

500,000 to 1,500,000 plaintiffs and over 100 (not all as yet identified) defendants, involving individual dealings, the questions of knowledge of the surcharge, reliance on the alleged misrepresentation, methods of concealment, and failure to disclose to each plaintiff, an adjudication of the 'common' question of conspiracy would not advance matters very far at all." *Id.* at 552.

Our case involves millions more plaintiffs, hundreds more defendants, and an even greater variety of alleged misrepresentations and surcharge amounts than *Cotchett, supra.* Without eliminating or eroding the traditional or statutory elements of a fraud action, there is no possibility that common questions can predominate over individual ones in these claims. *See* Advisory Committee's Note, Proposed Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966), wherein the Committee noted that a class action treatment may be unsuitable in a fraud case if there are material variations in the representations made or in the kinds or degrees of reliance by the plaintiffs. *See also* Simon, Class Actions—Useful Tool or Engine of Destruction, 55 F.R.D. 375 (1972).

The appellees' Sherman Act claims, while charging hundreds of hotels with similar conduct, nonetheless raise individual questions that could require decades of litigation. The appellees' allegation that a conspiracy existed to violate the antitrust laws does not insure that common questions will predominate. Advisory Committee's Note, *supra* at 103. In order substantially to establish each hotel's involvement in a conspiracy to violate the antitrust laws, each hotel's knowing participation would be a requisite element of proof. Furthermore, since the surcharges varied from hotel to hotel, the amount of each defendant's surcharge would necessarily require individual treatment, as would the period in which each hotel's surcharge was in effect. And while the amount of each hotel's surcharge might

constitute prima facie evidence of the amount of damage, the appellants might rebut that evidence by showing what the cost of each hotel's telephone service charge would have been in a competitive market. *See* Pollack, The "Injury" and "Causation" Elements Of a Treble Damage Antitrust Action, 57 Nw.L.Rev. 691, 692 (1963); Timberlake, The Legal Injury Requirements And Proof of Damages In Treble Damage Actions Under The Antitrust Laws, 30 Geo.Wash.L. Rev. 231 (1961–62). For a discussion of the statutory limitations within which plaintiffs must establish their damages, see Malina, Fluid Class Recovery As a Consumer Remedy In Antitrust Cases, 47 N.Y.L.Rev. 477, 492 (1972). After the basis for computing damages had been individually determined for each defendant, each member of the class seeking recovery would then be required to prove that he patronized the hotel while the surcharge was in effect and that he absorbed the cost of the surcharge. Furthermore, it would then be necessary to compute the amount of damages due the class member. In a class of forty million, assuming only ten percent of these unknown class members came forward with claims, and assuming the proof of each claim required only ten minutes, approximately one hundred years would yet be required to adjudicate the claims. Unless the court is to allow the procedural device of the class action to wear away the substantive requirements to maintain a private antitrust cause of action, this suit raises far too many individual questions to qualify for class action treatment.

The appellees have argued that many of the individual questions arising from the damage claims can be solved by allowing damages in the form of fluid recovery, relying on Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 318 F.2d 187 (1963), cert. denied 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); In Re Antibiotics Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y. 1971); and Daar v. Yellow Cab Co., 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d

732 (1967). Both *Bebchick* and *Daar* are inapposite, as neither case involved a statutory basis for recovery as do the federal antitrust laws. Furthermore, *Bebchick* was not even brought as a class action, and *Daar* arose under a state class action statute with requirements that differ from Rule 23. As for *In Re Antibiotic Antitrust Actions*, that case involved the approval and administration of a settlement by the District Court, rather than the actual recovery of gross damages for the class as a whole. We agree with the decision reached in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973), that allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes. Such enlargement or modification of substantive statutory rights by procedural devices is clearly prohibited by the Enabling Act that authorizes the Supreme Court to promulgate the Federal Rules of Civil Procedure.

 The District Court in this case has relied on the "imagination" of appellees' counsel to provide solutions that will, at some point in the future, prevent these individual issues from splintering the action into thousands of individual trials requiring years to litigate. Thus far the appellees have not been able to demonstrate to our satisfaction that the individual questions will not overwhelm the common questions, unless some of the required elements or allowed defenses in respect to the alleged claims are eliminated or impaired. The issues raised by the apparent existence of numerous individual questions must be resolved before a class is certified, even if certification is conditional. Conditional certification is not a means whereby the District Court can avoid deciding whether, at that time, the requirements of the Rule have been substantially met. The purpose of conditional certification is to preserve the Court's power to revoke

certification in those cases wherein the magnitude or complexity of the litigation may eventually reveal problems not theretofore apparent. But in this case the District Court seemed to brush aside one of the requirements of Rule 23(b)(3) by stating that at this time "analysis of the individual versus common question issue would be for the Court to act as a seer." However difficult it may have been for the District Court to decide whether common questions predominate over individual questions, it should not have sidestepped this preliminary requirement of the Rule by merely stating that the problem of individual questions "lies far beyond the horizon in the realm of speculation."

## II. *The Present Class Action Is Not the Superior Method of Adjudication.*

In attempting to satisfy the second requirement of Rule 23(b)(3), the appellees argue that maintaining individual actions is not economically feasible in this case. They contend that the suit must therefore proceed as a class action, regardless of its unmanageability. Furthermore, they maintain that if they are not allowed to proceed with their class action suit, the appellants will go "unpunished" for their alleged antitrust violations.

 Despite the appellees' arguments, the desirability of allowing small claimants a forum to recover for large-scale antitrust violations does not eclipse the problem of unmanageability. Eisen v. Carlisle & Jacquelin, *supra*. Some actions have been dismissed on the basis of manageability problems alone, particularly in cases involving large numbers of plaintiff class members. *See* Schaffner v. Chemical Bank, 339 F.Supp. 329 (S.D.N.Y.1972); City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J. 1971). In structuring this suit to include over six hundred defendants [2]

---

2. The appellees allege a far wider conspiracy than heretofore alleged in massive class actions. *See* Eisen v. Carlisle & Jacquelin, 52

F.R.D. 253 (S.D.N.Y.1971) (two alleged conspirators); West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970) (six

and millions of plaintiffs, the appellees have virtually insured that the litigation would be intolerably time-consuming and, because of the legal nature of the claims, involve a great variety of individual questions. As the Court noted in Morris v. Burchard, 51 F.R.D. 530, 535 (S.D.N.Y.1971), "It cannot be lightly overlooked that as a class gets larger it may transform a litigation into a gigantic burden on the Court's resources beyond its capacity to manage or effectively control." *See* Hackett v. General Host Corp., 1972 Trade Cases ¶ 73,879 (E.D.Pa.1970), app. dismissed, 455 F.2d 618 (3d Cir. 1972), cert. denied 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972); United Egg Producers v. Bauer International Corp., 311 F.Supp. 1375 (S.D.N.Y.1970); Ward v. Luttrell, 292 F.Supp. 165 (E.D.La.1968); Simon, Class Actions—Useful Tool or Engine Of Destruction, *supra*. In light of the fact that the proposed class action is likely to consume decades of judicial time, the potential benefit to the class should be carefully weighed against the burden the actions would place upon the federal courts. The average individual recovery in this case is estimated to be only two dollars. Even trebled, the amount of recovery would be entirely consumed by the costs of notice alone.[3] Nor could such administrative costs be minimized by notice by publication or random notice, since the individual class members are known and their addresses available in the appellants' records, thus requiring actual notice. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), Eisen v. Carlisle & Jacquelin, *supra*. In view of the nonexistent, or miniscule, recoveries that are likely to accrue to the supposedly intended beneficiaries, it is not surprising that most of the named plaintiffs are attorneys acting as counsel for themselves. Considering that this action has been primarily generated and financially supported by the lawyers who possibly stand to realize astronomical fees, and not by the individuals whose potential claims in any event are *de minimis*, we find the Court's conclusion in Berley v. Dreyfus Co., 43 F.R.D. 397, 398 (S.D.N.Y.1967) applicable here:

> ". . . we think that subparagraph (b)(3) read as a whole reflects a broad policy of economy in the use of society's difference-settling machinery. One method of achieving such economy is to avoid creating lawsuits where none previously existed. This is in part why 'the extent and nature of any litigation . . . already commenced' is pertinent to the required finding. If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason." (Footnotes omitted.)

Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute. *See* Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.1972); Cotchett v. Avis Rent-A-Car System, Inc., 56 F.R.D. 549 (S.D.N.Y.1972).

■ The appellees' attorneys have asserted that burdening the already strained judicial resources with this class action, which promises no real benefit to class members, is nonetheless jus-

---

alleged conspirators); In Re Antibiotic Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y.1971) (five alleged conspirators); Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn.1968) (six alleged conspirators); Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J.1971) (twelve alleged conspirators); Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969) (eighteen alleged conspirators).

3. In Cherner v. Transitron Electric Corp., 201 F.Supp. 934 (D.Mass.1962), distribution costs in administering the damage fund were $25.47 per claimant, excluding attorneys' fees, and $33.80 per claimant including those fees. *See* Comment, Managing the Large Class Action, 87 Harv.L.Rev. 426, 430 n. 31 (1973).

tified on the ground that allowing the suit will serve to "punish" and "deter" antitrust violations. But the Congressional scheme does not contemplate that private attorneys are to act as prosecutors to force antitrust violators to disgorge their illegal profits in the general interest of society at large. The antitrust laws focus on the compensation of parties actually injured, presupposing that a plaintiff can prove that he was in fact injured as a proximate result of an antitrust violation. Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The fact that the injured plaintiff is allowed treble damages does not change the basic nature of the private antitrust action as an action intended to compensate. When, as here, there is no realistic possibility that the class members will in fact receive compensation, then monolithic class actions raising mind-boggling manageability problems should be rejected. If, as appellees maintain, the suit would not be litigated except as a class action which would provide plaintiffs' attorneys with lucrative incentives, then "that decision of the legal marketplace may be the best reflection of a public consciousness that the time of the lawyers and of the court should best be spent elsewhere." Hackett v. General Host Corp., *supra*, 455 F.2d at 626. We agree with the Second Circuit's observation in Eisen v. Carlisle & Jacquelin, *supra*, that it is for the Congress to provide a solution if existing remedies do not adequately compensate consumers damaged by individually small, but illegal, charges. Judges should not significantly tamper with legislative enactments simply to satisfy their own individual notions as to sound public policy.[4]

In view of the following factors: (1) the predominance of individual questions over common questions; (2) the unmanageability of the litigation in terms of time, administrative costs, and complexity; (3) the minimal recovery it promises the potential individual class members; and (4) the initiation and financial maintenance of the suits primarily by attorneys acting in a dual capacity as named plaintiffs and counsel for the plaintiffs, we hold that the requirements of Rule 23 have not been met and that, consequently, the District Court's class certification was erroneous. Our conclusion in this respect renders it unnecessary to reach other issues presented in the appeal.

Reversed.[5]

---

4. As we stated in In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 130 (9th Cir. 1973):

 "Insofar as the common weal was injured the federal government was the proper party to seek redress . . . . If the Government did not prosecute its action with sufficient vigor, the remedy lies in executive or legislative reform, not in judicial overreaching."

5. This opinion was written prior to the Supreme Court's decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), which affirmed Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973). We see nothing in the Supreme Court's new opinion that is inconsistent with our decision here. To the extent that we have relied on the Second Circuit's opinion in *Eisen*, the Supreme Court's affirmance of that decision strengthens our own.